**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: BP p.l.c. | § | **MDL No. 10-md-2185** |
| **SECURITIES LITIGATION** | § | |
| | § | **Civil Action No. 11-cv-2941** |
| **Robert R. Glenn,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **HON. KEITH P. ELLISON** |
| | § | |
| **BP p.l.c.** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Defendant BP's Motion to Dismiss the Class Action

Complaint (Doc. No. 16; MDL Doc. No. 261).[1]  Having considered the parties' pleadings,

arguments, and the applicable law, the Court finds that Defendant's motion must be **GRANTED**.

**I.      BACKGROUND**

Robert Glenn[2] ("Glenn" or "Plaintiff"), an Oregon resident, asserts claims of assumpsit,

money had and received, unjust enrichment, and breach of contract against defendant BP p.l.c.

("BP," "the Company," or "Defendant").[3]  BP is a company organized under the laws of England

and Wales, with its global headquarters in London.  (Complaint ("Compl."), Doc. No. 1, ¶ 14.)

According to Plaintiff, BP is the largest oil and gas producer, operating in more than eighty

---

[1] All docket reference are to Case No. 11-cv-2941.  Where available, the corresponding docket numbers from Multi-District Litigation No. 10-md-2185 are also provided.

[2] According to the Complaint, Glenn seeks to represent a proposed class of all record shareholders of BP American Depositary Shares ("ADSs") as of May 7, 2010, *i.e.*, all persons who would have been entitled to receive the BP dividend on BP ADSs declared on April 27, 2010.  (Compl. ¶ 16.)  To date, Glenn is the only plaintiff in this lawsuit.

[3] The Court relates the facts of this case as alleged in the Complaint.  For purposes of a motion to dismiss, the court must accept plaintiff's well-pleaded factual allegations as true. Fed. R. Civ. P. 12(b)(6); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 550 (5th Cir. 2007).

countries, and is one of the largest gasoline retailers in the United States.  (*Id.*)  Plaintiff characterizes BP as "a predominantly American company" in that more than forty-percent of its fixed assets and upwards of thirty-percent of its workforce are located in the United States.  (*Id.*)  BP's American Depositary Shares ("ADSs") are listed and trade on the New York Stock Exchange ("NYSE").  (*Id.*)

Glenn's claims stem from the unusual trajectory of a dividend BP declared immediately following the Deepwater Horizon catastrophe.  The Deepwater Horizon rig exploded on April 20, 2010.  (Compl. ¶ 24.)  On April 27, 2010, BP announced that its Board of Directors had declared a quarterly dividend for the first quarter of 2010 in the amount of $0.84 per ADS, payable on June 21, 2010, to its shareholders of record as of May 7, 2010.  (*Id.*)  The total value of the dividend was approximately $2.6 billion.  (*Id.*)  Glenn claims that the declaration of this dividend created a binding obligation on the part of BP to pay the dividend on June 21, 2010, and created a legal "debt owed" by BP to the May 7, 2010 ADS shareholders.  (*Id.* ¶ 3.)

Between the declaration of the dividend and the date payment was due, BP took several actions that, according to Plaintiff, assured shareholders of the Company's continued intent to pay the dividend.  First, on May 10, 2010, BP announced the reference share price for its scrip dividend program.  (*Id.* ¶ 31.)  Second, on June 4, 2010, during a webcast with shareholders, BP stated that it was committed to "meet [its] obligations to [its] . . . hundreds of thousands of shareholders, and millions more in mutual and pension funds, who rely on their investment in BP as part of their financial security and in many cases their retirement income."  (*Id.* ¶ 33.)  Finally, on June 8, 2010, BP announced the amount of the Sterling dividend on its ordinary shares.  In connection with that announcement, BP referenced the dividend on its ADS shares, stating:

"As previously announced, the dividend payable to holders of American Depositary Shares ('ADSs'), each of which represents six ordinary shares, will be US$0.84 per ADS.  The dividend will be paid to holders of ADSs in cash in US dollars."  (*Id.* ¶ 32.)

According to Plaintiff, as it was making these alleged assurances, BP simultaneously was facing political pressure from the United States Congress and the Obama Administration.  On June 2, 2010, two U.S. senators sent BP a letter urging the Company to suspend its dividend.  (*Id.* ¶ 35.)  The letter further insinuated that BP's decision to go forward with the dividend payment would invite scrutiny by the Justice Department.  (*Id.*)  Dozens of U.S. representatives signed on to another similar letter, urging BP "to halt your planned dividend payout and cancel your advertising campaign until you have done the hard work of capping the well, cleaning up the Gulf Coast and making whole those whose very livelihoods are threatened by this catastrophe."  (*Id.* ¶ 36.)  On June 4, 2010, the same day that BP held its webcast with shareholders, President Obama publicly criticized BP's intention to pay the dividend.  (Compl.  ¶ 34.) (quoting Obama as saying, "[T]here are reports that BP will be paying $10.5 billion—that's billion with a B—in dividend payments this quarter. . . . Now I don't have a problem with BP fulfilling its legal obligations.  But I want BP to be very clear, they've got moral and legal obligations here in the Gulf for the damage that has been done.").

According to Plaintiff, BP was the loser in this political face-off.  On June 16, 2010, after a meeting with President Obama, BP announced that its board of directors had cancelled the previously declared first quarter dividend.  (*Id.* ¶ 38.)  BP issued a statement explaining that the Company had decided to cancel the dividend "in spite of [its] strong financial position and deep asset base."  (*Id.*)  Despite reporting losses during the first half of 2010 (attributed mainly to the creation of the $20 billion escrow fund for claims arising out of the Deepwater Horizon disaster), BP subsequently announced a third quarter profit of nearly $1.8 billion and declared a fourth

quarter dividend of $0.42 per ADS payable on March 28, 2011.  (*Id.* ¶ 42–44.)

Plaintiff contends that applicable law, as well as BP's Articles of Association, did not allow BP to cancel the properly declared dividend, despite any political pressure or public relations concerns the Company faced.  The Complaint thus contends that BP's decision to cancel the interim dividend put BP in breach of its legal obligation to its shareholders, including Plaintiff.  Plaintiff seeks to recover the unpaid dividend retained by BP and prejudgment interest.  (*Id.* ¶¶ 54, 60, 68, 74.)

Plaintiff's first claim, for assumpsit, alleges that BP's declaration of the dividend created an immediate binding obligation on BP to pay the dividend.  Plaintiff therefore seeks to enforce his right to receive the dividend.  Plaintiff's second claim, for money had and received, asserts the same.  Plaintiff's third claim, for unjust enrichment, asserts that it would be unjust to allow BP to retain the unpaid dividend to which Plaintiff is entitled.  Finally, Plaintiff brings a fourth claim, for breach of contract, alleging that the declaration of the dividend created a binding contract obligating BP to pay the dividend and created a corresponding right on the part of Plaintiff to enforce that contract.

Glenn originally filed suit in the U.S. District Court for the District of Oregon, Eugene Division, on April 7, 2011.  (Doc. No. 1.)  His case was transferred to this Court pursuant to an order from the United States Judicial Panel on Multidistrict Litigation ("MDL Panel").  (Transfer Order, Doc. No. 7.)  On September 20, 2011, BP filed a motion to dismiss the Complaint pursuant to Rules 12(b)(2) and 12(b)(6).  (Doc. No. 16; MDL Doc. No. 261.)  In its motion to dismiss, BP asserts three grounds for dismissal.  First, BP contends that, pursuant to the internal affairs doctrine, English law governs this case and well-settled English law allows a corporation to cancel an interim dividend at any time without incurring liability.  Second, BP argues that the

case is best left to the English courts and, therefore, the Court should dismiss this action on the basis of forum non conveniens. Finally, BP claims that this Court lacks personal jurisdiction over BP because the Complaint fails to allege that BP took or directed any activities in the state of Oregon.

On October 27, 2011, Plaintiff filed a response in opposition to BP's motion to dismiss (Doc. No. 25). BP filed a reply in support of its motion to dismiss on November 18, 2011 (Doc No. 33). This Court held oral argument on the motion to dismiss on February 10, 2012.

## II. LEGAL STANDARD

### A. 12(b)(2)

"The Due Process Clause of the Fourteenth Amendment operates to limit the power of a State to assert in personam jurisdiction over a nonresident defendant." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984). These due process requirements are only satisfied where "in personam jurisdiction is asserted over a nonresident corporate defendant that has 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted)). When a controversy "arises out of" a defendant's relationship with the forum state, the "relationship among the defendant, the forum, and the litigation" is the essential foundation of in personam jurisdiction. *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). However, even where the claim does not stem from a foreign corporation's activities in the forum state, "due process is not offended by a State's subjecting the corporation to its in personam jurisdiction when there are sufficient contacts between the State and the foreign corporation." *Helicopteros Nacionales*, 466 U.S. at 414.

"There are two types of personal jurisdiction: general and specific." *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995). "For general jurisdiction to exist over a nonresident defendant . . . the defendant must engage in continuous and systematic general business contacts . . . that approximate physical presence in the forum state." *Bixby v. KBR, Inc.*, No. 3:09-CV-632-PK, 2011 WL 2971848, at *5 (D. Or. June 16, 2011) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004)). This standard is intended to be an exacting one "because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 108**7** (9th Cir. 2000). Even if there is no general jurisdiction, a court may still exercise specific jurisdiction over a defendant if the case "arises out of" or is "related to" a defendant's forum-related activities. *Helicopteros Nacionales de Colombia*, 466 U.S. at 414.

Plaintiff bears the burden of establishing personal jurisdiction. *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995); *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). "Th[is] burden is greater in cases involving an alien defendant: 'litigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state because important sovereignty concerns exist.'" *Cai v. DaimlerChrysler AG*, 480 F. Supp. 2d 1245, 1248 (D. Or. 2007) (quoting *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988)); *see also Asahi Metal Ind. Co. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 115 (1987) ("Great care and reserve should be exercised when extending [U.S.] notions of personal jurisdiction into the international field.") (internal citation omitted). However, "where the district court relies solely on affidavits and discovery materials, the plaintiff need only establish a prima facie case of jurisdiction. If the trial court holds an

6

evidentiary hearing or the case proceeds to trial, however, the burden on the plaintiff shifts to the preponderance of the evidence."  *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 587 n.3 (9th Cir. 1993) (internal citations omitted).

### B.  12(b)(6)

In deciding whether to dismiss a case for failure to state a claim under Rule 12(b)(6), "the district court must take the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Mere "formulaic recitation of the elements of a cause of action will not do."  *Id.*  Even taking into account the liberal pleading standard set forth by Rule 12(b)(6), the court may not assume that a plaintiff can prove facts he has not alleged.  *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 443 (5th Cir. 1986).  Moreover, dismissal is appropriate where the complaint "lacks an allegation regarding a required element necessary to obtain relief."  *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (citation omitted).

In evaluating a 12(b)(6) motion, the court "must limit [its consideration] to the contents of the pleadings, including attachments thereto."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citing FED. R. CIV. P. 12(b)(6)).  Documents not attached to the pleadings, but to the motion to dismiss, may be considered "part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the] claim . . . [because i]n so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in

making the elementary determination of whether a claim has been stated." *Id.* at 498–99 (citing *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

## III. ANALYSIS

BP makes three arguments for dismissal: one on the merits as determined under English law, a second based on the doctrine of forum non conveniens, and a third based on lack of personal jurisdiction. This Court undertakes first the question of personal jurisdiction.[4] *See Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 431 (2007) (stating that federal courts have leeway to choose among threshold grounds for denying audience to a case on the merits).

In an order dated August 8, 2011, the MDL Panel transferred the instant action to this Court pursuant to 28 U.S.C. § 1407, for inclusion in the coordinated pretrial proceedings under MDL No. 2185. (Transfer Order, Doc. No. 7.) As the MDL Panel has explained, "[t]ransfers under Section 1407 are simply not encumbered by considerations of in personam jurisdiction and venue. . . . Following a transfer, the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer." *In re "Agent Orange" Product Liability Litig. MDL No. 381*, 818 F.2d 145, 163 (2d Cir. 1987) (quoting *In re FMC Corp. Patent Litig.*, 422 F. Supp. 1163, 1165 (J.P.M.D.L. 1976)). The MDL Panel has also clarified "that the phrase 'pretrial proceedings' encompasses a motion to dismiss for lack of personal jurisdiction." *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 511 F. Supp. 2d 742, 789 (S.D. Tex. 2002); *see also In re Gypsum Wallboard*, 302 F. Supp. 794, 794 (J.P.M.L. 1969) ("Motions to . . . dismiss for lack of jurisdiction are being routinely considered by courts to which multidistrict litigation has

---

[4] Because the Court resolves the issue of personal jurisdiction, the Court does not reach Defendant's other two arguments for dismissal.

previously been transferred and we see no good reason why [the defendant] can not pursue its remedies following transfer.").

### A. The Oregon Court lacks personal jurisdiction over BP p.l.c.

In cases transferred pursuant to 28 U.S.C. § 1407, the choice of law rules of the transferor court are applied.  *See In re Enron*, 511 F. Supp. 2d at 791 (explaining that courts in the Southern District of Texas have found transfers pursuant to § 1407 more akin to transfers under § 1404(a) than § 1406).  Because Glenn's claim was filed originally in the district court of Oregon, this Court must apply Oregon choice of law rules.  This Court thus may exercise personal jurisdiction over BP only to the extent that the transferor Oregon district court could do so.  *In re Enron*, 511 F. Supp. 2d at 789 (noting that, where case was transferred by MDL Panel from Connecticut, the court "would have the same in personam jurisdiction as the transferor Connecticut federal court, and no more").

Here, Plaintiff alleges that federal jurisdiction is based on diversity of citizenship. (Compl. ¶ 10.)  When federal jurisdiction is based on diversity of citizenship, a federal court may exercise personal jurisdiction over a nonresident defendant (i) if the long-arm statute of the forum state confers personal jurisdiction over the defendant and (ii) if the exercise of jurisdiction by the forum is consistent with due process.  *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 893 (9th Cir. 1996); *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999). Looking to Oregon law, it is apparent that "Oregon's long-arm statute confers jurisdiction to the extent permitted by due process." *Gray & Co. v. Firstenberg Mach Co.*, 913 F.2d 758, 760 (9th Cir. 1990); *see also* OR. R. CIV. P. 4L.  As a result, the Due Process Clause defines the scope of personal jurisdiction in this case.  *See State ex rel. Circus Circus Reno, Inc. v. Pope*, 854 P.2d 461, 463 (Or. 1993) (explaining that the Due Process Clause governs the scope of jurisdiction

under Oregon civil procedure rules).

For the exercise of personal jurisdiction to be consistent with the Due Process Clause of the Constitution, the Court must find (1) that the defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with that forum state and (2) that the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867 (5th Cir. 2011). "Minimum contacts can be established either through contacts sufficient to assert specific jurisdiction, or contacts sufficient to assert general jurisdiction." *Id.*

Plaintiff claims that he satisfies the Rule 8 mandate that the complaint contain "a short and plain statement of the grounds for the court's general jurisdiction" with the three sentences in the Complaint related to personal jurisdiction over BP. The relevant three sentences are the following:

- "This Court has personal jurisdiction over BP pursuant to Rule 4(k)(1)(a) of the Federal Rules of Civil Procedure because BP is subject to the jurisdiction of the courts of general jurisdiction in this district." (Compl. ¶ 11.)

- "Venue is proper in this district pursuant to 28 U.S.C. § 1391 because BP is subject to personal jurisdiction here and a substantial part of the events giving rise to the claims occurred in this district." (*Id.* ¶ 12.)

- "BP operates through its affiliates and subsidiaries, and its designated agent in the United States is BP America, Inc., a Delaware corporation registered and authorized to conduct business in the state of Oregon." (*Id.* ¶ 14.)

As discussed above, two forms of personal jurisdiction may be applied to a nonresident defendant: general jurisdiction and specific jurisdiction. Defendant contends that the allegations in the Complaint are insufficient to establish a *prima facie* case for personal jurisdiction over BP under either of the two grounds because the allegations fail to demonstrate contacts between BP

and the state of Oregon.   The Court considers both possibilities for conveying personal jurisdiction over BP below.

## 1.  General jurisdiction

In order to find that general jurisdiction exists, this Court must determine whether BP's contacts with the state of Oregon constitute minimum contacts, that is, "the kind of continuous and systematic general business contacts" that would justify the exercise of general personal jurisdiction. *See Helicopteros Nacionales*, 466 U.S. 408, 416 (1984).  Plaintiff does not contend that his claim against BP "arises out of" BP's activities in the state of Oregon.  Instead, Plaintiff argues that "presence" is an established basis for general jurisdiction and that, under principles of agency, BP has maintained continuous physical presence in Oregon sufficient to allow for the exercise of general jurisdiction.  (Plaintiff's Opposition, Doc. No. 25, at 26; MDL Doc. No. 284.) Specifically, Plaintiff argues that because BP America, BP's subsidiary, is authorized to transact business in Oregon and has been a registered agent in Oregon since 2000, BP has sufficient contacts with Oregon to subject it to general jurisdiction.[5]

Defendant contends that Plaintiff has failed to adequately allege that BP America is BP's agent for purposes of establishing jurisdiction in Oregon and argues that reference to a subsidiary as an agent in SEC filings, without more, is insufficient to establish agency for.  Additionally, even assuming BP America is BP's agent in the United States (which Defendant does not

---

[5] In cases in which a federal court "draws its authority directly from federal law, and does not borrow from state law," Rule 4(k)(2) applies. *Submersible Sys., Inc. v. Perforadora Central, S.A. de C.V.*, 249 F.3d 413, 420 (5th Cir. 2001). If a defendant does not concede jurisdiction in another state, Rule 4(k)(2) allows a court to consider the defendant's contacts with the United States as a whole, rather than any particular state. FED. R. CIV. P. 4(k)(2); *see also Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646 (5th Cir. 2004).  Here, Rule 4(k)(2) provides no basis for jurisdiction based on BP's direct contacts because BP has no contacts of its own with the United State beyond listing its stock on the NYSE.  "Plaintiff ha[s] cited no authority for the proposition that such contacts suffice to establish personal jurisdiction, and the Court is not persuaded that Congress intended for the courts to assert jurisdiction under Rule 4(k)(2) whenever a corporation lists its stock on a United States exchange." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  BP's remaining potential contacts with the United States are, therefore, based on the activities of its subsidiaries—here, BP America specifically.  Plaintiff does not propose that the Court should exercise personal jurisdiction over BP under Rule 4(k)(2), and the Court thus focuses analysis on any relationship BP might have with Oregon through the alleged contacts of BP America.

11

concede), Defendant claims that a subsidiary's authorization to conduct business in Oregon does not by itself establish personal jurisdiction over BP. (Defendant's Reply, Doc. No. 33, at 16–17; MDL Doc. No. 301.) Because Plaintiff's jurisdictional argument rests entirely on the alleged contacts of BP's subsidiary, the Court must first determine whether BP America has sufficient minimum contacts with the state of Oregon and, if so, whether BP America's contacts are properly attributed to BP, that is, whether BP America is Defendant's agent for purposes of jurisdictional analysis.

### a. Plaintiff has failed to allege that BP America conducts continuous and systematic activities in Oregon of the kind sufficient to constitute minimum contacts

Plaintiff's argument for general jurisdiction over BP hinges on a finding that BP America, Defendant's subsidiary in the state of Oregon, has sufficient contacts with the state to allow this Court to impute those contacts to Defendant.[6] In order for this Court to exercise personal jurisdiction over BP, the Court must inquire whether BP's—and, by extension, BP America's—"continuous corporate operations within [the] state [are] thought so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely distinct from those activities." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 318 (1945)) (internal quotations omitted). This standard is a "fairly high" one and "requires the contacts to be of the sort that approximate physical presence within the state." *Sams v. Geico Corp.*, No. CV 01-1458-BR, 2002 WL 31975065, at *4 (D. Or. Nov. 27, 2002) (quoting *Bancroft & Masters, Inc. v.*

---

[6] In the Complaint, Plaintiff avers that BP "is a predominantly American company" because it has "more than 40 percent of its fixed assets and more than 30 percent of its employees located in the United States." (Compl. ¶ 14.) Plaintiff also points out that "BP is the largest oil and gas producer and one of the largest gasoline retailers in the United States." (*Id.*) Even if Plaintiff's characterization of the facts is accurate, such facts are insufficient to establish that BP itself engages in continuous and systematic activities in *Oregon*. Because BP's own presence in Oregon is limited to having a subsidiary in the state, that presence is insufficient to establish personal jurisdiction over BP as the nonresident defendant. *See Cai v. DaimlerChrysler AG*, 480 F. Supp. 2d 1245, 1251 (D. Or. 2007). Presumably because Plaintiff does not dispute that BP has no direct presence in Oregon, Plaintiff limits his argument for personal jurisdiction to the alleged minimum contacts BP America has with the state.

*Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000)).  In considering whether Plaintiff has adequately alleged continuous and systematic contacts, the Court may consider factors such as the following: (1) whether the defendant makes, sells, solicits, or engages in business in the state; (2) whether the defendant serves the state's market; (3) whether the defendant holds a license in the state; (4) whether the defendant designates an agent for service of process in the state; and (5) whether the defendant is incorporated in the state.  *See Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1478 (9th Cir. 1986).

Here, Plaintiff does not seek to establish the minimum contacts of the named defendant, BP.  Instead, Plaintiff hopes to rely on the minimum contacts of BP's subsidiary, BP America. BP America is not a party to this lawsuit.  According to the Complaint, BP America, a Delaware corporation, is a BP subsidiary[7] and is BP's "designated agent in the United States."  (Compl. ¶ 14.)  The Complaint concludes that BP America is BP's agent because BP lists BP America as its "agent in the USA" in the Company's 20-F reports filed with the SEC in 2003 through 2010. (Declaration of Jacob S. Gill ("Gill Declaration"), Doc. No. 25, Exhibit K.)  These same SEC filings list an Illinois address as BP America's contact information.  (*Id.*)  In the only reference specifically tied to Oregon, Plaintiff notes that BP America has been authorized to transact business in Oregon since at least 2000, according to a certificate from the Office of the Secretary of State of Oregon.  (Gill Declaration, Doc. No. 25, Exhibit L.)  This very limited portrait of BP America provides the Court with no basis to determine whether BP America engages in business in Oregon or otherwise serves the Oregon market.  Plaintiff avers that BP America is registered to do business in the state of Oregon but supplies no substance to these allegations to allow the Court to conclude that BP America has any kind of presence—and certainly not a physical

---

[7] Plaintiff concedes that BP no longer owns a 100% interest in BP America.  (Doc. No. 25, at 29; MDL Doc. No. 284.)  In 2007, BP interposed BP Holdings North America Limited ("BPHNA"), a company that acts as a holding company for BP's ownership interest in BP America.  (*Id.*)

presence—in Oregon at all.

BP America's registration in the state is not evidence of the "systematic and continuous contacts" with the state of Oregon required for the minimum contacts analysis. Plaintiff relies on a Ninth Circuit case, *Bauman v. DaimlerChrysler*, for the proposition that the presence of a foreign company's subsidiary in the United States is sufficient to justify personal jurisdiction over the foreign parent. *Bauman v. Daimler Chrysler Corp.*, 644 F.3d 909 (9th Cir. 2011). Plaintiff reads *Bauman* too broadly. In *Bauman,* the plaintiffs argued that the California district court had personal jurisdiction over DCAG, a German company, through its U.S. subsidiary, Mercedes-Benz USA. *Id.* at 913. Although neither party disputed that MBUSA was subject to general jurisdiction in California, the plaintiffs in *Bauman* provided detailed allegations concerning the subsidiary's actions in the state. *Id.* at 914. Specifically, MBUSA was the single largest supplier of luxury vehicles in California at the time. *Id.* at 914. MBUSA's sales in California accounted for almost 2.5% of DCAG's total profit worldwide. *Id.* MBUSA also operated a regional office in California and purchased cars from DCAG for distribution there. *Id.* This combination of facts evidencing MBUSA's important presence in California weighed heavily in the court's determination that personal jurisdiction over DCAG existed. *Id.* at 914–15.

Here, Plaintiff states that BP America's revenue accounts for more than forty percent of BP's fixed assets and thirty percent of BP's employees, but this contention, even if true, fails to link BP America *to the state of Oregon* in any way. (Compl. ¶ 14.) *Compare Martinez v. Aero Caribbean*, 2012 WL 1380247, *2 (N.D. Cal. Apr. 20, 2012) (finding no basis to exercise general jurisdiction where only 1% of foreign parent corporation's sales were made to a California corporation and that sales contracts were signed in France); *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 381 (9th Cir. 1990) (stating that "[o]nly 1.29% and 1.06% of Carnival's

cruise business was derived from residents of Washington . . . . This court has held under somewhat similar facts that the exercise of general jurisdiction would violate due process."), *rev'd sub nom. on other grounds by Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991).

Plaintiff has not pleaded any facts to suggest what actions BP America took in Oregon, either at its own behest or on behalf of BP.  "[P]laintiff[] ha[s] not met [its] burden to produce evidence sufficient to establish that [BP] is the corporate parent of any subsidiary with continuous and systematic business contacts approximating physical presence in Oregon" because Plaintiff fails to point to any subsidiary with the requisite minimum contacts.  *Bixby v. KBR, Inc.*, No. 3:09-CV-632-PK, 2011 WL 2971848, at *5 (D. Or. June 16, 2011).  The Court cannot impute contacts that do not exist.  Plaintiff has not pointed to BP America's "systemic and continuous contacts" with the state of Oregon and has therefore failed to lay the groundwork that would allow this Court to impute any of BP America's contacts to its parent, BP.

### b.  *Plaintiff has not adequately pleaded an agency relationship between BP p.l.c. and BP America*

In the alternative, even if Plaintiff could show that BP America had minimum contacts with the state of Oregon, Plaintiff has not pleaded an agency relationship between BP and BP America so as to allow this Court to impute to Defendant any theoretical contacts BP America might have.  The fact that a relationship between a parent company and a subsidiary exists does not automatically establish personal jurisdiction over the parent on the basis of the subsidiary's minimum contacts with the forum.  *Doe v. Unocal*, 248 F.3d 915, 925 (9th Cir. 2001); *see also Bixby*, 2011 WL 2971848, at *2, *6 (holding that a parent corporation was not subject to general jurisdiction based on the contacts of a subsidiary registered to do business in Oregon); *Sams v. Geico Corp.*, 2002 WL 31975065, at *5–6.  "[T]he Supreme Court [has] articulated a generally applicable principle that a parent corporation may be directly involved in the activities of its

subsidiaries without incurring liability so long as that involvement is 'consistent with the parent's investor status.'" *Unocal*, 248 F.3d at 926 (quoting *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)).  In contrast, "if the parent and subsidiary are not really separate entities, or one acts as an agent of the other, the local subsidiary's contacts with the forum may be imputed to the foreign parent corporation."  *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996), *abrogated on other grounds by Samantar v. Yousuf*, 130 S. Ct. 2278 (2010).

The Ninth Circuit has developed two separate tests for determining whether an "alter ego" or "agency" relationship exists between parent and subsidiary such that it is appropriate to exercise personal jurisdiction over the foreign parent.  The alter ego test requires a showing of a high level of "parental control" over the subsidiary.  *Bauman*, 644 F.3d at 919.  Specifically, the alter ego test requires Plaintiff to show "(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice."  *Id.* (internal citation omitted).  Plaintiff does not contend that this test applies to the relationship between BP p.l.c. and BP America. Instead, Plaintiff argues that the agency test applies.  The agency test has two parts.  The first prong of the test is satisfied where a subsidiary is of "sufficient importance" to the parent company such that "the actions of the subsidiary can be understood as a manifestation of the parent's presence."  *Bauman*, 944 F.3d at 920.  The second prong of the test if satisfied where the parent company has a "right of control" over the subsidiary.  *Id.*

> i.  *Plaintiff has not alleged sufficient facts to conclude that BP America's operations in Oregon are "sufficiently important" to BP for purposes of the agency test*

The agency test "is predicated upon a showing of the *special importance* of the services performed by the subsidiary."  *Bauman*, 644 F.3d at 919.  Specifically, the agency test looks to whether the "subsidiary functions as the parent corporation's representative in that it performs

services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Id.* (internal citation and quotation marks omitted). Courts have thus imputed contacts "where the subsidiary was 'either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself.'" *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994) (quoting *Gallagher v. Mazda Motor of America, Inc.*, 781 F. Supp. 1079, 1083–84 (E.D. Pa. 1992)). In considering whether a subsidiary is of sufficient importance to its parent, "the court may consider such factors as the percentage of the non-resident corporation's business that comes from the purported general agent and whether the purported general agent is the nonresident corporation's only agent within the forum." *Sams v. Geico Corp.*, 2002 WL 31975065, at *5. Ultimately, the Court must answer the following question: "Are the services provided by [BP America in Oregon] sufficiently important to [BP] that, if [BP America] went out of business, [BP] would continue [operations] itself, or alternatively by [operating] through a new representative?" *Bauman*, 644 F.3d at 920. The lack of detail in the Complaint makes it impossible for the Court to answer this question in the affirmative.

Here, Plaintiff fails to make out a prima facie case that BP's subsidiary in Oregon is its agent for purposes of personal jurisdiction. Plaintiff has alleged no facts to suggest that BP would conduct Oregon operations in BP America's absence. Plaintiff's failure is very basic in nature: he does not allege that BP America was operational in Oregon at all. Instead of focusing on BP America's activities in Oregon, Plaintiff seeks to hang jurisdiction on references to BP America's general presence in the United States. For example, Plaintiff cites the significant percentage BP America contributes to BP's total assets, calling it "critical to the foreign

17

principal's business operations" overall.  (Doc. No. 25, at 28.)  The only allegation connecting

BP America to Oregon is that BP America was registered to do business in the state of Oregon.

(Compl. ¶ 14.)  Mere registration in the state is not evidence that BP America conducts Oregon

operations.  *See Montantes v. Destiny Manufactured Homes*, No. 07-1834-KI, 2008 WL 916996,

at *2 (D. Or. 2008) (finding that parent corporation "cannot be subject to jurisdiction [in Oregon]

simply because one of its subsidiaries does business here"); *see also Harris Rutsky & Co. Ins.

Servs., Inc. v. Bell & Clements, Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003).  Plaintiff has failed to

point to any business that BP gained or maintained as a result of BP America's presence in

Oregon.  Similarly, Plaintiff does not allege that BP America engaged in the type of business in

Oregon that BP generally conducts worldwide.  *Compare Sams v. Geico Corp.*, 2002 WL

31975065, at *5 (finding insufficient evidence to conclude that Geico's subsidiaries in Oregon

acted as agents of Geico Corporation where defendant pointed to no evidence that subsidiary

issued insurance policies to Oregon residents or otherwise conducted business on Geico's

behalf); *see also Cai v. DaimlerChrysler AG*, 480 F. Supp. 2d 1245, 1252 (D. Or. 2007) (holding

that German stock corporation was not subject to general personal jurisdiction in Oregon even

though corporation was publicly traded in the United States and had subsidiary in Oregon

because subsidiary's communications with plaintiff did not support finding of agency

relationship).

        Here, Plaintiff has not pleaded any facts to suggest *what* actions, if any, BP America took

in Oregon.  *See Unocal*, 248 F.3d at 930 (finding that a California subsidiary of a multinational

energy corporation was not an agent of the parent corporation where it did not play a role in

finding the parent companies to acquire in California, did not increase its parent's business

portfolio, did not help effectuate acquisitions, and did not have any employees).  "At an

irreducible minimum, the general agency test requires that the agent perform *some service or engage in some meaningful activity* <u>in the forum state</u> on behalf of its principal such that its presence substitutes for presence of the principal." *Unocal*, 248 F.3d at 930 (internal citation omitted) (emphasis added). Because Plaintiff has not pointed to any activity BP America carried out in Oregon on BP's behalf, Plaintiff has given this Court no basis to conclude that BP America's presence in Oregon specifically was "sufficiently important" to BP.

> ii.     *Plaintiff does not allege facts sufficient to demonstrate that BP p.l.c. exercised over BP America the amount of control contemplated under the agency test*

Plaintiff similarly is unable to meet the "control" prong of the agency test. The "control" prong requires Plaintiff "to show an element of control, albeit not as much control as is required to satisfy the 'alter ego' test." *Bauman*, 644 F.3d at 920. Although actual control of the subsidiary by the principal is not necessary, the principal and agent must at least "agree that the principal has the *right* to [control]." *Id.* at 923.

In *Bauman*, in deciding that personal jurisdiction over DCAG existed, the California court relief heavily on the general distributor agreement that established detailed, specific terms governing the relationship between DCAG and MBUSA. *Id.* at 914–15. That agreement gave DCAG extensive oversight over MBUSA's activities, required MBUSA to consult with DCAG before making changes to its business network, determined employee positions and job titles, allowed DCAG to approve all accounting and other processes at MBUSA, prohibited MBUSA from altering any vehicles before sale, and gave DCAG unilateral authority to set all prices. *See Bauman*, 644 F.3d at 923 ("We can think of no clearer manifestation of assent to the principal's right to control than the comprehensive written agreement between [principal] and [subsidiary]."); *see also United States v. Bonds*, 608 F.3d 495, 507 (9th Cir. 2010) (explaining that although the agreement need not be explicit, "there must be at least some manifestation of

assent" to the right to control").  Unlike in *Bauman*, where the plaintiffs explained the extensive intertwining of the German parent and its U.S. subsidiary, here Plaintiff points to very little evidence of any relationship between BP and its Oregon subsidiary.

There is no document manifesting an assent to control here.  Instead, Plaintiff argues that BP's right to control BP America is evidenced in the fact that BP owns BP America and that BP expressly designated BP America as its agent in the United States.[8]  (Doc. No. 25, at 29; MDL Doc. No. 284.)  "The mere presence of an 'authorized agent' . . . of a foreign corporate defendant . . . does not establish continuous and systematic activities" in a state.  *Zamarron v. Shinko Wire Co., Ltd.*, 125 S.W.3d 132, 144 (Tx. App.—Houston [14th Dist.] 2004, no pet.); *Wenche Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183 (5th Cir. 1992) (holding that the "mere act of registering an agent" does not create "general business presence in Texas"); *Martin v. D-Wave Sys. Inc.*, No. C-09-03602 RMW, 2009 WL 4572742, at *2 (N.D. Cal. Dec. 1, 2009).  Similarly, other courts in the Ninth Circuit have declined to exercise jurisdiction based solely on appointment of a California agent for service of process.  *See, e.g.*, *DVI, Inc. v. Superior Court*, 104 Cal. App. 4th 1080, 1095 (2002) (finding no personal jurisdiction where defendant company registered to do business in California, maintained a California agent for service of process, and had two officers residing in California); *Gray Line Tours v. Reynolds Elec. & Eng'g Co.*, 193 Cal. App. 3d 190, 193–95 (1987) (holding that designation of an agent for service of process and qualification to do business in California, without more, did not confer general jurisdiction).

In further support of his agency argument, Plaintiff points to a statement made by Lamar McKay ("McKay"), chairman and president of BP America during the relevant period, to the Senate Committee on Energy and Natural Resources.  In that statement, McKay represented that

---

[8] All of the alleged facts referenced here as support for Plaintiff's agency argument were brought to the Court's attention for the first time in Plaintiff's response, as Plaintiff failed to include facts relevant to the agency analysis in the Complaint.

he worked as "part of an executive team that reports directly to our Global CEO, Tony Hayward." (Gill Declaration, Doc. No. 25, Exhibit J, at 5.)  McKay characterized his position as one in which he was "responsible for broad oversight and connectivity across all of our US-based businesses." (*Id.*)  Plaintiff also argues that BP exercised actual control over BP America as evidenced by the two companies' coordinated disaster recovery efforts. (Doc. No. 284, at 29.) Plaintiff refers specifically to BP's response to the Texas City disaster in 2005, in which BP appointed a new chairman and president of BP America and created "an advisory board to assist BP America Inc.'s management in monitoring and assessing BP's US operations." (BP 2006 Annual Report, Gill Declaration, Doc. No. 25, Exhibit L.)

Although the control prong does not require Plaintiff to point to as much control as required to satisfy the "alter ego" test, factors considered under the alter ego test nonetheless guide this Court's analysis here. *Bauman*, 644 F.3d at 920.  In the alter ego context, a demonstrated "commonality of officers and directors" is insufficient to establish an agency relationship between parent and subsidiary. *See, e.g.*, *Zamarron*, 125 S.W.3d at 42; *see also BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 799 (Tex. 2002).  Here, Plaintiff points to one alleged representation by McKay, President of BP America during the relevant period, that he "worked as part of an executive team" that reported to higher-ups at BP.  The isolated nature of this allegation is insufficient to demonstrate that BP controlled BP America. Similarly, Plaintiff's contention that BP's supervision of the response operations to the Texas City disaster does not establish a pattern of control over BP America. *See, e.g.*, *Zamarron*, 125 S.W.3d at 142 (noting that visits by engineers from the Japanese parent company to the subsidiary plant to engage in problem solving and troubleshooting did not evidence control exerted over the daily operations of the subsidiary).  Once again, the underlying shortcoming in

the Complaint undercuts Plaintiff's attempt to demonstrate the necessary relationship between BP and BP America: the Complaint alleges no connection between any control BP allegedly exercised—either with regard to the oil spill response efforts or with respect to the overlapping corporate hierarchy between the two companies—over BP America *as it operated in Oregon*. Plaintiff's allegations fail to detail any sort of ongoing relationship between parent and Oregon subsidiary sufficient to exercise general jurisdiction over BP.

"The bottom line is that [BP p.l.c.]'s presence in Oregon is limited to having a subsidiary [t]here, which is 'insufficient to establish personal jurisdiction' over a nonresident defendant." *Cai*, 480 F. Supp. 2d at 1251.  With respect to Oregon, Plaintiff points to what is, at bottom, a nominal agency relationship and nothing more; Plaintiff cites an SEC filing in which BP named BP America its "agent" and a certificate from Oregon registrar attesting that BP America is licensed to do business there.  Such a nominal agency relationship, without more, is insufficient to demonstrate the element of control required under the agency test.  While BP America may be licensed to do business in Oregon on BP's behalf, there are no allegations to suggest when it did so, how it did so, or if it ever did so at all.

A defendant's activities must justify the conclusion that the defendant could reasonably anticipate being called into an Oregon court.  Here, Plaintiff has not met his burden of showing that BP's subsidiary in Oregon should be treated as BP's agent for jurisdictional purposes under the agency doctrine adopted by the Ninth Circuit.  In addition, Plaintiff has not demonstrated that BP America, even if it were BP's agent, has sufficient minimum contacts with Oregon to justify Court's exercise of general jurisdiction over BP.  Plaintiff alleges only speculative contact by BP and BP America with Oregon, raising nowhere near the continuous and systematic contacts required to establish general jurisdiction.

## 2.  Specific jurisdiction

"[W]hen a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum, the State is exercising 'specific jurisdiction' over the defendant."  *Helicopteros Nacionales de Colombia*, 466 U.S. at 414, n. 8.  "Specific jurisdiction is only relevant if the defendant's 'contacts with the forum give rise to the cause of action before the court.'"  *Bauman*, 644 F.3d at 911 (quoting *Unocal*, 248 F.3d at 928).  When the "defendant has 'purposely directed' his activities at residents of the forum," courts in that state may exercise specific jurisdiction in cases that "arise out of or relate to those activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 472–73 (1985).  In order for the Court to find specific jurisdiction, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (internal citation omitted).

The Ninth Circuit has established the following three-part test to evaluate the nature and quality of a defendant's contacts so as to determine the availability of specific jurisdiction:

> (1) The nonresident defendant must do some act or consummate some transaction within the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.
>
> (2) The claim must be one which arises out of or results from the defendant's forum-related activities.
>
> (3) The exercise of jurisdiction must be reasonable.

*Unocal*, 248 F.3d at 923.  The Ninth Circuit has elaborated on "the requirements for purposeful availment, noting that purposeful direction of some act having effect in the forum constitutes sufficient contact to exert jurisdiction, and that a lesser showing of contacts with the forum may

be sufficient if considerations of reasonableness so require." *Id.* at 923–24.

The Complaint states that "a substantial part of the events giving rise to the claims" occurred in the Oregon, yet fails to elaborate on action taken by either BP or BP America in Oregon or directed toward Glenn.  BP America is registered in the state of Oregon.  Plaintiff resides in Oregon and purchased stock in BP, presumably on the NYSE, where BP ADSs trade. (Compl. ¶ 14.)  There are no facts suggesting that BP had any direct contacts with Oregon that gave rise to Plaintiff's cause of action.  *See, e.g.*, *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 772–73 (5th Cir. 1988) (rejecting specific jurisdiction when the injured contractual relationship was negotiated outside the forum, contemplated no performance in the forum, and pertained to the sale of stock of a company that had no connection with the forum); *Indah v. U.S. S.E.C.*, 661 F.3d 914, 921 (6th Cir. 2011) (upholding district court decision finding facts insufficient to establish specific jurisdiction and noting that "no authority support[s] the proposition that personal jurisdiction may be established merely as a result of a purchase of stock on a public exchange by a resident of the forum state").  Plaintiff thus has failed to make out a prima facie case for specific jurisdiction over BP.

## IV.   CONCLUSION

Plaintiff has failed to allege minimum contacts with the state of Oregon—either by BP or through an agency relationship with BP America—as required for this Court to exercise general jurisdiction over BP.  Plaintiff has also failed to make out a prima face case for specific jurisdiction over BP.  Because this Court lacks personal jurisdiction over BP p.l.c., Defendant BP's Motion to Dismiss the Class Action Complaint (Doc. No. 16; MDL Doc. No. 261) is **GRANTED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 5th day of July, 2012.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE